UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x
HERMAN MEDINA,

              Plaintiff,                    **MEMORANDUM & ORDER**
                                           13-CV-2323 (KAM)

     -against-

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.
-----------------------------------x
**KIYO A. MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), plaintiff Herman Medina ("plaintiff") appeals the final decision of the Commissioner of Social Security ("defendant" or "the Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act") on the grounds that plaintiff is not disabled within the meaning of the Act. Plaintiff alleges that he is disabled under the Act and is thus entitled to receive SSI benefits due to several severe medically determinable impairments, namely onychomycosis (fungal infection) of the toenails, obesity, osteoarthritis of the lower back and feet, and venous stasis of the lower extremities, which he alleges has prevented him from performing any work since November 2007. Presently before the court are defendant's motion for judgment on the pleadings and plaintiff's cross-motion for judgment on the pleadings or, in the alternative, for remand. For the reasons set forth below, the Commissioner's motion is DENIED,

plaintiff's motion is GRANTED IN PART, and the case is remanded for further proceedings consistent with this memorandum and order.

**BACKGROUND**

## I.  *Non-Medical Facts*

Plaintiff was born on May 16, 1971.[1] (Tr. 162.)  He was 36 years old at the alleged disability onset date (November 30, 2007). (*Id.*)  He is a United States citizen by birth. (*Id.*)  He has never been married and has no children. (Tr. 162, 68.) Plaintiff received a high school diploma and is literate in English and Spanish. (Tr. 72, 174.)  Plaintiff was last employed as a bus monitor with Consolidated Bus Co., where he cleaned the bus yard and assisted passengers in wheelchairs. (Tr. 89, 193, 200.) Before that, he worked as a driver for an airplane cleaning company, where his duties included driving a cargo truck and cleaning out airplanes. (Tr. 176.)  He has also worked as a furniture mover, a temporary laborer, a ramp agent at John F. Kennedy Airport, a carpet cleaner, and a security guard. (Tr. 90, 194-98.)

## II.  *Medical Facts*

### A.  Plaintiff's Pre-Hearing Statements Regarding His Symptoms

---

[1] Citations to the administrative record are indicated by the abbreviation "Tr."

In a disability report filed on July 6, 2009, plaintiff stated that he experienced pain and arthritis in both feet, and a fungal nail infection in his blood stream. (Tr. 175.) He reported that he could not stand up, take public transportation, wear regular shoes, or walk without the assistance of a cane. (*Id.*) Plaintiff claimed that when he wore shoes, he had to take the laces out because his feet would become swollen. (*Id.*) Plaintiff stated that he was taking prescription pain medications, but that they made him feel drowsy. (Tr. 178.)

In a function report submitted to the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations, plaintiff stated that due to his illness he was no longer able to go to parks, the beach, or stores. (Tr. 204.) He reported that he was no longer able to take public transportation or work. (*Id.*) He stated that he experienced significant amounts of pain that interfered with his ability to sleep, stand for long periods of time, prepare food, do laundry and other housework, and walk without the assistance of a cane. (Tr. 209.) He reported that he did not go outside often because he was at risk of falling and could only walk for about ten feet before he had to stop and rest. (*Id.*) He said that he felt pain in his feet and lower back. (Tr. 211.) He described the pain as a "stabbing, throbbing, burning, prickly feeling." (*Id.*) He explained that the pain began in 2007 and worsened over time. (Tr.

211-12.)  He claimed that he felt pain every day, that the pain was "constent [sic] all day," and that walking and standing caused pain.  (Tr. 212.)  Plaintiff reported that he had been taking a 50 mg dose of the pain medication Tramadol since April 10, 2008, but that "it [did] not work" and gave him headaches.  (*Id.*)

In a disability report submitted on November 5, 2009, plaintiff reported that his pain was worsening and that he could not walk.  (Tr. 185.)  He said that he was trying to get a wheelchair.  (*Id.*)  He reported becoming "homebound" and unable to travel by himself in June 2009.  (*Id.*)  He alleged that he needed the assistance of a cane to walk to the bathroom and that his family members assisted him.  (Tr. 188.)  He stated that he had taken pain medication prescribed to him at Staten Island University Hospital ("SIUH") and that he was experiencing no side effects. (Tr. 187.)

**B.   Medical Records Submitted to the Administrative Law Judge Regarding Plaintiff's Disability**

1.   Treating Relationship with Dr. Garbis Dabaghian, M.D.

Dr. Garbis Dabaghian was plaintiff's primary care physician.  (Tr. 76.)  Plaintiff had been seeing Dr. Dabaghian regularly beginning in November 2009.  (Tr. 294-95.)  The notes from many visits contain multiple sets of handwriting and many of the notes are illegible, so the precise nature and extent of the treating relationship remains somewhat unclear.  (*See* Tr. 294-95,

298-299, 302-03, 315-16, 319-20.)  The notes generally reflect plaintiff's consistent complaints of pain in his feet and lower back, and his difficulty walking.  (*Id.*)

On May 25, 2011, Dr. Dabaghian provided a Report of Physical Impairment, which contains his opinion regarding plaintiff's Residual Functional Capacity ("RFC") and ability to work.  (Tr. 415-17, 444-445.)  He made a notation on the questionnaire that plaintiff "presents in a wheel chair and claims he can't walk." (Tr. 463.)  Dr. Dabaghian found that plaintiff could: (1) never lift or carry zero to five pounds; (2) stand or walk for fewer than two hours in a workday; (3) sit for fewer than two hours in a workday without altering position due to his leg pain; and (4) never bend, squat, climb, or reach. (Tr. 462-63.) Dr. Dabaghian completely restricted plaintiff from activities involving unprotected heights, moving machinery, exposure to changes in temperature and humidity, driving, and exposure to dust, fumes, and gases. (Tr. 464.) Dr. Dabaghian noted that plaintiff had to lie down for over four hours each day due to his pain and that he was unable to stand or walk for more than two hours without stopping to rest.  (Tr. 462-63.)  He further reported that plaintiff could not use his hands for simple grasping, pushing or pulling of arm controls, or fine manipulation.  (Tr. 464.)  He stated that plaintiff could also never use either foot for repetitive movements such as pushing or pulling of leg controls.

5

(*Id.*)  Dr. Dabaghian stated that work on a continuous and regular basis would cause plaintiff's condition to deteriorate and that his condition would interfere with his ability to work.  (*Id.*)

### 2.  Other Treatments and Diagnostic Evaluations with Specialists at SIUH

Plaintiff also regularly saw podiatrists and other specialists at SIUH.  On May 25, 2007, plaintiff visited the SIUH emergency room complaining of bilateral burning pain in his toes and infection.  (Tr. 218-24.)  He was diagnosed with tinea pedis (ringworm or athlete's foot) and onychomycosis (fungal infection).  (Tr. 221, 222, 224.)  He was given an antifungal gel.  (Tr. 222.)

On July 23, 2007, plaintiff visited the SIUH Diabetic Foot Center for an initial physical and was seen by podiatrists Luis Mora and Tekchand Thakurdial.  (Tr. 257-60.)  It was noted that plaintiff had a history of asthma and gout.  (Tr. 258.)  Plaintiff's chief complaint was his fungal toe nails, which he stated had been bothering him for months.  (*Id.*)  His muscle strength was measured at 5/5 in both feet, with no deformity noted; his hallux (big toe) and ankle range of motion were within normal limits.  (Tr. 259.)  Plaintiff was diagnosed with onychomycosis and prescribed Lamisil.  (Tr. 260, 261.)

On July 25, 2007, an x-ray exam was requested by Dr. Mario Castellanos, M.D.  (Tr. 229.)  The reason given for the exam was plaintiff's history of gout.  (Tr. 413, 237.)  The exam showed

a radiographically normal right foot. (Tr. 413.) It showed no apparent fracture, dislocation, arthritic change, or other significant bony abnormality. (*Id.*) The soft tissues were also normal. (*Id.*)

At a March 27, 2008 appointment, Dr. Thakurdial completed a progress note. (Tr. 262-64.) He reported that plaintiff complained of fungal toenails and noted that he had requested "a letter stating his condition so he can take it to court and get medical insurance." (Tr. 263.) He also noted that plaintiff had been taking Lamisil in the past but has never finished the three-month treatment because of his "insurance status." (*Id.*) He noted that plaintiff had "elongated, discolored toenails." (*Id.*) Dr. Thkurdial ordered diagnostic x-rays after plaintiff complained of pain. (Tr. 228-29, 236, 342, 414.) The x-rays of his right foot showed joint spaces with moderate 1st MTP joint degenerative change with a 6 mm subchondral cyst (a cyst situated beneath cartilage) in the metatarsal head, 6 mm insertional Achilles enthesophyte,[2] mild dorsal mid-foot soft tissue swelling, and no acute fracture. (Tr. 228, 236, 342, 414.) X-rays of plaintiff's left foot showed no acute fracture; a 2 mm

---

[2] "An enthesophyte is a bony spur forming at a ligament or tendon insertion into bone, growing in the direction of the natural pull of the ligament or tendon involved." Juliet Rogers et al., *Bone Formers: Osteophyte and Enthesophyte Formation are Positively Associated* 89 (1997), *available at* http://ard.bmj.com/content/56/2/85.full.pdf+html.

plantar and 4 mm posterior heel spur;[3] mild 1st MTP joint degenerative change; and indications of a chronic sprain in the hallux. (Tr. 229, 237, 340, 412.)

On September 4, 2008, plaintiff saw the attending rheumatologist at the SIUH arthritis clinic. (Tr. 268-69.) Plaintiff complained of bilateral foot pain. (Tr. 269.) The doctor noted that there was no swelling, plaintiff's range of motion was good, and there was no synovitis or squeeze tenderness. (*Id.*) Plaintiff requested a "letter to be written to not work," to which the doctor responded that first he needed to be evaluated, and requested an MRI of plaintiff's right foot. (*Id.*) The x-ray was "unremarkable" and the doctor prescribed 500 mg of Naprosyn. (*Id.*)

On September 24, 2008, an MRI of plaintiff's right foot was requested by Dr. Mark Goldstein. (Tr. 419.) The clinical indication given for the exam was "extensive pain." (*Id.*) The test showed that plaintiff had edema[4] within the distal margin of

---

[3] A heel spur is "a bony growth that usually begins on the front of [the] heel bone and points toward the arch of [the] foot." *Diseases and Conditions: Bone Spurs*, Mayo Clinic, *available at* http://www.mayoclinic.org/diseases-conditions/bone-spurs/expert-answers/heel-spurs/faq-20057821.

[4] Edema is a condition characterized by excess watery fluid collection in the cavities or tissues of the body. When left untreated, edema can cause painful swelling, difficulty walking, stiffness, stretched skin, increased risk of infection, and decreased blood circulation. *See Diseases and Conditions: Edema*, Mayo Clinic, *available at* http://www.mayoclinic.org/diseases-conditions/edema/basics/definition/con-20033037.

the first metatarsal without a discrete fracture line, which suggested osteochondral injury, adjacent to the first metatarsophalangeal joint space. (*Id.*) No additional significant internal derangements were noted. (*Id.*)

Plaintiff came to the SIUH arthritis clinic on January 29, 2009 complaining of joint pain in his big toes. (Tr. 277-78.) It was noted that plaintiff had a fungal infection, but had been "non-compliant with podiatry." (Tr. 277.) The exam showed mild tenderness at the MTP joint of the great toes bilaterally, and the diagnosis was osteoarthritis. (*Id.*) Plaintiff was prescribed a 500 mg dose of Naprosyn to be taken every 12 hours, but it was noted that he had also not been compliant with the regimen of Naprosyn he had previously been prescribed. (*Id.*) The attending rheumatologist, Felicia Tenedios-Karanikolas, M.D., additionally wrote: "[h]e wants a note to say he is homebound and wants permanent disability." (Tr. 278.) She reported that plaintiff had not taken any over-the-counter pain medication. (*Id.*) Dr. Tenedios-Karanikolas concluded that there was no systematic rheumatological process and that plaintiff should be in pain management because he was "non-compliant with recommendations and disruptive to clinic." (*Id.*)

On June 11, 2009 plaintiff again visited the SIUH arthritis clinic complaining of right toe pain. (Tr. 287.) Plaintiff said that pain medications gave mild relief before

wearing off. (Tr. 287.) The doctor noted that plaintiff "continue[d] to request paperwork for insurance to say that he cannot work." (*Id.*) Plaintiff refused to take off his shoes for the exam. (*Id.*) Plaintiff was diagnosed with osteoarthritis and prescribed a 50 mg dose of Tramadol to be taken every 12 hours. (*Id.*) The doctor further recommended that he start physical therapy. (*Id.*)

Plaintiff saw Dr. Thakurdial at the SIUH foot clinic on June 22, 2009. (Tr. 289.) In his report from the exam, Dr. Thakurdial wrote that "after [plaintiff] demonstrates his case to the SSI doctors he will schedule an appointment to treat his nails." (*Id.*)

On November 19, 2009, plaintiff had an appointment with Dr. Dabaghian. (Tr. 294-95.) Plaintiff complained of foot pain and numbness and requested a prescription for a wheelchair. (Tr. 294.) Dr. Dabaghian did not record findings regarding plaintiff's feet or lower extremities but noted the diagnosis of osteoarthritis and onychomycosis, for which plaintiff was referred to a dermatologist. (Tr. 294-95.)

On a November 10, 2009 visit to SIUH, Dr. Rita Choueiry, M.D., provided plaintiff with a prescription for a wheelchair, though she did not state a reason. (Tr. 466.)

At an appointment on February 18, 2010 with Dr. Dabaghian, plaintiff was referred to a rheumatologist, pain

management, and dietary counseling. (Tr. 298-99.) Dr. Dabaghian noted that there was "[n]o medical reason for [plaintiff's] wheelchair." (Tr. 298.) Plaintiff said he was using a wheelchair because he experienced pain when walking and described the pain as constant, but worse in the morning and when walking. (Tr. 302.)

Plaintiff returned to SIUH on March 5, 2010, and it was noted that he had not taken any medication for two months. (Tr. 302-03.)

At a September 2, 2010 visit to SIUH's arthritis clinic, plaintiff "demand[ed]" that paperwork be filled out for disability. (Tr. 312-13.) Notes from the visit reflect that plaintiff had been noncompliant with his treatments. (Tr. 436.)

On September 8, 2010, plaintiff had an appointment with Dr. Dabaghian. (Tr. 422-23.) Dr. Dabaghian stated that due to severe osteoarthritis in his knees and feet, plaintiff's mobility was limited, he was home-bound, and he required a wheelchair and ambulette transportation. (*Id.*)

At a September 9, 2010 visit to the SIUH clinic, plaintiff told a social worker that the physical therapy department would not see him until he had his toe nails cut by a podiatrist. (Tr. 314.)

On November 4, 2010, Dr. Dabaghian requested an MRI of plaintiff's lumbar spine. (Tr. 457.) The clinical indication was lower back pain on the right side. (*Id.*) The exam showed

spondyloarthritic changes with loss of disc height and annular bulging of the T12-L1 disc. (*Id.*) There was no evidence of significant spinal stenosis. (*Id.*)

At an appointment on November 5, 2010 with Dr. Dabaghian, it was noted that plaintiff had possible polyneuropathy (general degeneration of peripheral nerves) of unknown origin, lumbar radiculopathy (disease of the root of a nerve), and degenerative joint disease. (Tr. 316.)

At a February 23, 2011 appointment, Dr. Dabaghian noted that plaintiff stated that could not walk, but Dr. Dabaghian determined that plaintiff's condition did not "justify his wheelchair bound status." (Tr. 317.) Plaintiff declined pain medications. (Tr. 318.) Dr. Dabaghian ordered below-the-knee compression socks to treat plaintiff's venous stasis.[5] (Tr. 418, 421.)

On April 19, 2011, plaintiff saw a podiatrist to have his toe nails cut. (Tr. 321, 446.)

At a May 25, 2011 visit to the SIUH neurology clinic, plaintiff complained of pain in his lower extremities and an inability to walk. (Tr. 322-23.) An examination of his lower extremities revealed edema. (Tr. 322.) Plaintiff's motor strength was 3/5, and reflexes were absent in his knees but present in his

---

[5] Venous stasis is a condition of slow or insufficient blood flow, usually in the legs. *See Venous Stasis*, Stedman's Medical Dictionary (2014).

ankles.  (*Id.*)  Plaintiff had pain on palpitation of the lumbar paraspinal muscles.  (Tr. 323.)  The neurologist's diagnosis was foot pain of non-neurological cause and venous stasis.  (*Id.*)

At an appointment on May 25, 2011, Dr. Dabaghian noted bilateral edema in plaintiff's lower extremities.  (Tr. 324.)  Dr. Dabaghian prescribed below-the-knee compression stockings.  (Tr. 421.)

### 3.  Treating Relationship with Christopher Szeles, M.D.

Dr. Christopher Szeles, a physical medicine and rehabilitation specialist, wrote two letters (on October 2, 2009 and September 23, 2011) stating that plaintiff had bilateral hallux osteoarthritis and was unable to work.  (Tr. 468.)

### 4.  Treating Relationship with SIUH Social Workers

On October 7, 2009, two social workers wrote that plaintiff had been requesting a wheelchair since 2007. (Tr. 290-91.)  They noted that they had explained to plaintiff that medical necessity and an evaluation were required before a wheelchair could be ordered.  (Tr. 290-91.)  Plaintiff reportedly became loud and argumentative on the phone, and said that he wanted his own wheelchair so that he would not have to rely on the ambulance services for transportation to and from the hospital.  (Tr. 290.)

On July 6, 2011, social worker Cini Mottola wrote a note in Dr. Dabaghian's RFC questionnaire that plaintiff was

"unemployable in [his] present condition due to mobility restrictions [and] is wheelchair dependent." (Tr. 464.)

On September 22, 2011, Mottola wrote a letter stating that plaintiff "utilizes a cane/walker in the home for ambulation due to excruciating lower back pain that puts the patient at risk for falls." (Tr. 467.) She noted that his "mobility is limited rendering him essentially homebound." (*Id.*) She also reported that "[p]resently, the patient is wheelchair dependent when out in the community attending to essential tasks." (*Id.*) She further observed that "[t]he patient's level of functioning hinders his ability to utilize transportation or to walk more than five feet without assistance at this time." (*Id.*)

It is unclear from the record whether plaintiff had additional treating physicians, x-rays or MRIs. Records from August 26, 2010 and November 5, 2010 indicate that x-rays were ordered for plaintiff's ribs and/or lower back, but the x-rays were not included in the record. (Tr. 310, 315.)

> 5. Consultative Examination Report by Anita Shulman, M.D. (August 26, 2009)

On August 26, 2009, plaintiff was examined by Dr. Anita Shulman. (Tr. 242.) She noted that plaintiff was 6'1" and 270 pounds, and he appeared to be in "no acute distress." (Tr. 243.) Dr. Shulman reported that plaintiff had been taking Naprosyn and Tramadol, but had finished his prescriptions and was then taking

Tylenol and aspirin. (Tr. 242.) She noted that plaintiff had been prescribed physical therapy, but had not started. (*Id.*) Dr. Shulman observed that plaintiff was unable to walk without the assistance of the cane or holding on to a stable object. (*Id.*) She further noted that his "gait is steady but slow" and that he was using a cane, though it had not been prescribed by a physician. (Tr. 243.) Dr. Shulman observed that plaintiff did not need help changing for the exam, or getting on and off the table. (*Id.*) He was "able to rise from a chair with assistance without difficulty." (*Id.*) Upon examination, his lumbar spine showed "limited flexion/extension to about 130 degrees," otherwise normal lateral flexion, and full rotary movement bilaterally. (Tr. 244.) Dr. Shulman also noted "slight redness around the first MTP joint on both toes" and "evidence of swelling on the dorsum of his feet, the left more so than the right." (*Id.*) Her diagnosis was osteoarthritis of plaintiff's right first MTP joint. (*Id.*) With regard to plaintiff's ability to do work-related activities, Dr. Shulman noted that "it will be difficult for the claimant to do any type of work which involves prolonged standing, pushing, pulling, lifting." (*Id.*)

### 6. Consultative Examination Report by Chitoor Govindaraj, M.D. (June 23, 2011)

On June 23, 2011, Dr. Chitoor Govindaraj conducted a consultative examination on plaintiff. (Tr. 347.) Dr. Govindaraj,

however, was not able to complete a full examination because plaintiff "refuse[d] to leave his wheelchair for examination. He [did] not even want to stand up or go to the examination table." (*Id.*) Dr. Govindaraj was therefore unable to evaluate plaintiff's spine movements or ability to walk. (Tr. 348.) From the exam that he performed, Dr. Govindaraj observed that plaintiff's feet showed no redness, warmth, or tenderness. (*Id.*) Dr. Govindaraj also noted no cyanosis and no clubbing in the extremities. (*Id.*) He observed minimal pedal ankle and edema. (*Id.*) Plaintiff's peripheral pulses were 3/4, and "knee jerks in the wheelchair sitting position could not be elicited." (Tr. 348.) He also reported that plaintiff weighed 245 pounds. (Tr. 347.) Dr. Govindaraj gave plaintiff an overall good prognosis. (Tr. 348.)

### 7. Consultative Examination Report by Dana Jackson, Psy. D. (June 28, 2011)

On June 28, 2011, Dr. Dana Jackson performed a consultative evaluation on plaintiff. (Tr. 352-53.) She noted that he was in a wheelchair and exhibited average intellectual skills. (*Id.*) Dr. Jackson observed that "[t]he claimant's allegations and this current mental status evaluation do appear to be consistent with each other." (Tr. 352.) She diagnosed plaintiff with pain in both feet, osteoarthritis, and obesity. (Tr. 352-53.)

## III. *Procedural History*

On May 28, 2009 plaintiff filed a Title XVI application for SSI. (Tr. 162-165.) Plaintiff listed his disability onset date as November 30, 2007, claiming that he had been unable to work due to pain caused by arthritis in both feet and a fungal nail infection in his blood stream. (Tr. 175.) Plaintiff's claim was denied on October 1, 2009. (Tr. 95-103.) Plaintiff subsequently requested a hearing. (Tr. 104-106.) A very brief hearing before Administrative Law Judge Robert C. Dorf on May 16, 2011 was adjourned so that plaintiff could obtain representation. (Tr. 53-59.) No substantive testimony was provided at the first hearing.

The second hearing with Administrative Law Judge Jack Russak ("the ALJ" or "ALJ Russak"), which led to the decision under review, was held on September 26, 2011. (Tr. 60-94.)

A. **Testimony by Plaintiff**

At the hearing before ALJ Russak, plaintiff testified that he lived alone in a single room occupancy in Staten Island. (Tr. 68.) He had to climb three stairs to enter his building. (*Id.*) In his room he had a bed and a refrigerator, but no other furniture. (Tr. 79.) He said that he did not have a television and lived out of a suitcase. (*Id.*) Plaintiff testified that he remained in his wheelchair throughout the day and that his brother visited him on weekdays in the morning to prepare food, help him dress, and do his laundry. (Tr. 69-78, 174.) Without his

brother's assistance, plaintiff stated that he was unable to fully dress himself and was only able to wear shorts, not pants. (Tr. 69-70.) On weekends, when his brother did not visit, plaintiff consumed only water and juice. (Tr. 78) Plaintiff also claimed to be unable to wear shoes or boots due to the pain in his feet. (Tr. 70.) He explained that he was only able to sleep two to two-and-a-half hours each night because of pain. (Tr. 79.) Plaintiff testified that he had no visitors besides his brother, did not have a car, and that he was not a member of any church or other social organization. (Tr. 70-71.) Plaintiff stated that he only left his apartment for medical appointments. (Tr. 71.)

Plaintiff testified that the pain in his feet and lower back was "excruciating" and that he was "wheelchair bound." (Tr. 77-78.) He said that he was unable to stand for any prolonged period of time, and that he could not walk at all. (Tr. 78.) Plaintiff testified that Dr. Dabaghian was his primary care physician, treating him for osteoarthritis, a fungal blood infection, and venous stasis. (Tr. 76.) Compression socks were ordered by a specialist to treat the venous stasis. (*Id.*) Plaintiff explained that Dr. Dabaghian also referred him to podiatrists and other specialists. (*Id.*) Plaintiff reported that he was prescribed unspecified pain medication, but at the time of the hearing was not taking any medication because it offered only temporary relief. (*Id.*) He also said that his wheelchair was

prescribed by his physician in 2009. (Tr. 78.) When asked by the ALJ if he had experienced any dramatic weight loss in the last five years, plaintiff reported that he had not. (Tr. 67.)

**B.    Testimony by Peter Schosheim, M.D.**

Dr. Peter Schosheim testified as a medical expert at the hearing. Dr. Schosheim, a board certified orthopedic surgeon who had reviewed plaintiff's medical records, never met, treated, or personally examined plaintiff. (Tr. 80-82.) Dr. Schosheim diagnosed plaintiff with bilateral painful feet and mild to moderate arthritis of the first MP joints of both feet. (Tr. 83-84.) He noted that plaintiff had been tested for rheumatoid arthritis, but that the results were negative. (Tr. 83.) Dr. Schosheim also reported that plaintiff had a history of venous stasis disease in his lower extremities, which was being treated with compression stockings. (*Id.*) He noted plaintiff's history of asthma and fungal disease of the toes. (*Id.*) He reported that plaintiff's medical records clearly showed that plaintiff had no atrophy, strength deficits, or loss of range of motion in his lower extremities, aside from the first MP joint. (*Id.*) Dr. Schosheim stated that the results of several MRIs showed plaintiff had edema of the first metatarsal phalangeal joint of both feet and arthritic changes in his lumbar spine with loss of disc height and annular bulging. (Tr. 83-84.)

Dr. Schosheim further testified that plaintiff's illnesses did not, either individually or in combination, meet or exceed any of the medical listings. (Tr. 84.) Dr. Schosheim concluded, however, that plaintiff's RFC has been affected by the pain in his feet. (*Id.*) Dr. Schosheim determined that plaintiff could occasionally lift/carry and push/pull 20 pounds, but could frequently lift/carry and push/pull ten pounds. (Tr. 85.) He stated that plaintiff could stand and/or walk with normal breaks for a total of two hours in an eight-hour day, and sit for a total of six hours in an eight-hour day. (*Id.*) He also determined that plaintiff could never balance or climb ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs. (*Id.*) Dr. Schosheim observed that plaintiff could frequently stoop, kneel, and crouch, and could occasionally crawl. (*Id.*) He testified that plaintiff had no manipulative, visual, or communicative limitations, but would need to avoid all exposure to hazards, machinery, and unprotected heights. (*Id.*) Dr. Schosheim also mentioned the inconsistencies between his own assessment and Dr. Dabaghian's RFC. He explained that he did not agree with Dr. Dabaghian's assessment. (Tr. 86.)

### C. Testimony by Vocational Expert David A. Sypher, M.S., C.R.C.

David Sypher testified as a vocational expert at the hearing. (Tr. 86.) Sypher reviewed plaintiff's medical records

and questioned him at the hearing. (*Id.*) He testified that plaintiff was unable to perform any of his past work. (Tr. 91.) To determine if plaintiff would be able to perform any work that existed in significant numbers in the national and regional economy, the ALJ asked Sypher several hypothetical questions. (Tr. 90.) In the first scenario, the hypothetical claimant of plaintiff's age, education, and work experience was able to engage in light work as defined by the regulation, but had the postural limitation that he could only occasionally climb ladders and ramps, balance, stoop, crouch, kneel, and crawl. (*Id.*) Sypher responded that it would be possible for the hypothetical claimant to work as a food checker, a dispatcher, or an electrical engineer, jobs that existed in significant numbers in both the national and regional economies. (Tr. 90-92.) The ALJ changed the scenario slightly by postulating that the hypothetical claimant would never be able to climb ladders or ramps, balance, stoop, crouch, kneel, crawl, or use foot controls. (Tr. 92.) Sypher responded that the same three occupations would still be suitable. (*Id.*) In the third scenario, the ALJ altered the original hypothetical by adding that the claimant must avoid concentrated exposure to cold, unprotected heights, moving machinery, and exposure to irritants such as fumes, odors, dust, gases, poorly ventilated areas, and chemicals. (Tr. 93.) Sypher again replied that the three previously discussed

occupations would still be suitable for the hypothetical claimant. (*Id.*)

**D.    The ALJ's Decision**

On October 17, 2011, the ALJ, after applying the five-step evaluation process for determining whether an individual is disabled under the Act,[6] issued his decision finding that plaintiff was not disabled.  (Tr. 15-32.)  Under step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the application date.  (Tr. 20.)  At step two, he determined that plaintiff suffered from "the following severe impairments: onychomycosis (fungal infection) of the toenails; obesity; osteoarthritis of the low back and of the first MTP joint in both feet; venous stasis of the lower extremities" and "the non-severe impairment of asthma."  (Tr. 20.)  The ALJ also found that plaintiff's impairments "result in vocationally significant limitations and have lasted at a 'severe' level for a continuous period of more than 12 months."  (*Id.*)

At step three of the analysis, the ALJ found — based on the lack of objective medical evidence, and Dr. Schosheim's testimony grounded on the lack of positive findings on physical examination — that plaintiff did not have an impairment or combination of impairments that met or equaled the listed

---

[6] The five-step evaluation process is explained in more detail *infra*. (*See* Discussion Part II.)

impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (Tr. 21.) The ALJ considered Listings 1.02A ("Major dysfunction of a joint"), 1.06 ("Fracture of . . . one or more of the tarsal bones"), and 1.04A ("Disorders of the spine"), but found that the criteria were not met. (*Id.*)

At step four of the sequence, the ALJ found that plaintiff had the RFC "to perform a reduced range of light work as defined in 20 C.F.R. 416.967(b)." (*Id.*) The ALJ further held that plaintiff's impairments could reasonably be expected to cause the alleged symptoms, but that his statements regarding the intensity, persistence, and limiting effects of his ailments were not credible. (Tr. 22.)

At step five, citing the testimony of vocational expert Sypher, the ALJ found that plaintiff was unable to perform any past relevant work. (Tr. 28.) The ALJ then considered plaintiff's age, education, work experience, and RFC, and found that there were jobs existing in significant numbers in the national and regional economies that plaintiff could perform. (Tr. 28-29.)

When the Appeals Council denied plaintiff's request for review of the ALJ's decision on February 14, 2013, the ALJ's decision became the final decision of the Commissioner. (Tr. 7-11.) Plaintiff timely filed the instant complaint. (ECF No. 3.) The Commissioner subsequently filed a motion for judgement on the pleadings. (ECF No. 18, Memorandum in Support of Defendant's Motion

for Judgment on the Pleadings ("Def. Mem.").) Plaintiff then retained counsel and filed a cross-motion for judgment on the pleadings. (ECF No. 31, Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.").) The Commissioner did not file a reply brief.[7]

## DISCUSSION

### I. *Standard of Review*

The district court's review of the Commissioner's final decision is governed by 42 U.S.C. § 405(g). The court does not review *de novo* whether plaintiff is disabled. *Parker v. Harris*, 626 F.2d 225, 231 (2d. Cir. 1980). The district court "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted). Rather, the court assesses: (1) whether proper legal standards for a disability determination were applied and (2) whether substantial evidence supports the Commissioner's decision. *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012); *see also Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010). The district court may set aside the Commissioner's decision only if the findings are not supported by substantial

---

[7] Plaintiff filed a second application for disability, but the application was dismissed when plaintiff failed to appear for a hearing. (ECF No. 33.)

evidence or if the decision is based on legal error. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also Balsamo v. Chater*, 142 F.3d 75, 79-81 (2d Cir. 1998).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted). When a reviewing court considers the substantiality of the evidence, the court must consider the whole record, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted)

If the reviewing court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the claimant's position. *See Batista v. Barnhart*, 326 F. Supp. 2d 345, 352 (E.D.N.Y. 2004). The reviewing court is also authorized to remand the Commissioner's decision to allow the ALJ to further develop the record, make more specific findings, or clarify his rationale. 42 U.S.C. § 405(g); *Grace v. Astrue*, No. 11-CV-9162, 2013 WL 4010271, at *14 (S.D.N.Y. July 1, 2013); *see also Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) ("[W]here the

administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate.").

In order for the court to reverse the Commissioner's denial and grant benefits, the claimant must show that he is entitled to benefits based solely on the record. *See Williams v. Apfel,* 204 F.3d 48, 50 (2d Cir. 2000) (holding that an award of benefits is appropriate only where the record "provide[s] persuasive evidence of total disability that [would render] any further proceedings pointless"); *see also Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013) (declining to reverse a denial of benefits because plaintiff had not shown he was entitled to benefits based on the record alone).

## II.  *Determining Disability Through the Five-Step Evaluation*

To be eligible for disability benefits, a claimant must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d).  The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Further, the claimant's alleged impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the Commissioner analyzes the claim using a "five-step sequential evaluation." 20 C.F.R. § 416.920; *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (describing the five-step process); *see also Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). If the Commissioner can determine that a claimant is or is not disabled at any point, the evaluation stops at that step and the Commissioner issues his decision. 20 C.F.R. § 416.920(a)(4).

At step one, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. § 416.920(a)(4)(i). If the claimant is engaged in substantial gainful employment, he is not disabled and is ineligible for benefits, "regardless of his medical condition." 20 C.F.R. § 416.920(b). Otherwise, the Commissioner moves to step two. 20 C.F.R. § 416.920(a)(4)(ii).

At step two, the Commissioner determines whether the claimant has a "severe medically determinable physical or mental impairment" of some duration that would significantly hinder his physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(a)(4)(ii); *Rosa*, 168 F.3d at 77. If such medical impairment exists, the analysis moves to step three, in which the Commissioner compares the claimant's impairment to a listing of

impairments found in 20 C.F.R. Part 404, Subpart P, Appendix I. 20 C.F.R. § 416.920(a)(4)(ii).  The analysis is based solely on medical evidence.  *Rosa*, 168 F.3d at 77.  If the claimant's impairment "meets or equals" one of the listed impairments, he is per se disabled irrespective of his "age, education, and work experience."  20 C.F.R. § 416.920(d).

If the claimant is not per se disabled under step three, the Commissioner must determine the claimant's RFC before moving to step four.  20 C.F.R. § 416.920(e).  RFC is defined as an individual's ability to do physical and mental work activities on a sustained basis despite limitations imposed by his impairment. 20 C.F.R. § 416.945(a)(1).  To determine a claimant's RFC, the Commissioner is to consider "all of the relevant medical evidence," in addition to descriptions and observations by non-medical sources, like social workers.  20 C.F.R. § 416.945(a)(3).

When the Commissioner's RFC determination relies on plaintiff's own statements with respect to his symptoms, the Commissioner must follow a two-step process for determining the credibility of plaintiff's statements.  20 C.F.R. § 416.929(c)(3). First, the "adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) . . . that could reasonably be expected to produce the individual's symptoms . . . ."  *Id.*  Second, "the adjudicator must evaluate the intensity, persistence, and limiting effects of

the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . ." *Cataneo v. Astrue*, No. 11-CV-2671, 2013 WL 1122626, at *11 (E.D.N.Y. Mar. 17, 2013) (internal quotation marks and citation omitted).

Upon determining a claimant's RFC, the Commissioner proceeds to step four, at which point the Commissioner determines whether the claimant's RFC is sufficient to perform his "past relevant work," which is defined as substantial gainful activity that the claimant has performed within the past fifteen years. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f), 416.960(b)(1). If the Commissioner finds that the claimant can perform his past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(f). Otherwise, the Commissioner must move to step five to determine whether the claimant can make "an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(V). The claimant bears the burden of proof for the first four steps. At the fifth step, the burden shifts to the Commissioner to show that the claimant can engage in gainful employment that exists within the national economy. *Valet v. Astrue*, No. 19-CV-3282, 2012 WL 194970, at *11 (E.D.N.Y. Jan. 23, 2012).

At step five, the Commissioner employs his prior RFC findings in conjunction with the claimant's "vocational factors" (i.e. age, education, and work experience) to determine whether

the claimant can transition to another job that is prevalent in the national economy. *See* 20 C.F.R. §§ 416.920(g)(1), 416.960(c)(1). The Commissioner's burden, under step five, is limited to considering "evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant could perform in light of his RFC and vocational factors. 20 C.F.R. § 416.960(c)(2). If the Commissioner finds that the claimant cannot transition to another job prevalent in the national economy, the claimant is disabled. *See* 20 C.F.R. § 416.920(g)(1).

In making his determination through the five-step process, "the Commissioner must consider four factors: (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)).

## III. *Plaintiff's Credibility*

Plaintiff contends that the ALJ erred in his determination regarding plaintiff's credibility and did not properly explain his evaluation. Plaintiff argues that: (1) the ALJ did not explicitly address all the factors outlined in 20 C.F.R. § 416.929(c)(3) for determinations of claimant credibility; (2) the ALJ did not specify how plaintiff's claims of pain factored

into his RFC determination; and (3) his complaints of pain can support a finding that he is disabled, even if not fully supported by objective medical evidence.

The ALJ discredited plaintiff's statements about the severity and limiting nature of his symptoms on the grounds that his claims about his pain levels and day-to-day life were improbable and not substantiated by clinical findings or other medical evidence.  To support his conclusion regarding plaintiff's credibility, the ALJ cited: (1) plaintiff's lack of weight loss in light of his claim that he consumed one meal per day on a weekdays and subsisted on water and juice on weekends; (2) his noncompliance with prescribed medication and treatments; (3) his failure to take prescribed pain medication; and (4) behaviors potentially indicating malingering, including demanding that his doctors write notes that he was unable to work and insisting that he be given a wheelchair.  The Commissioner asserts that the ALJ applied the appropriate legal standards and that his determination is supported by substantial evidence.

A claimant's statements about his subjective symptoms alone cannot serve as conclusive evidence of disability.  42 U.S.C. § 423(d)(5)(A); *see also Williams v. Astrue*, No. 09-CV-3997, 2010 WL 5126208, at *13 (E.D.N.Y. Dec. 9, 2010).  When a claimant supports allegations of disability with subjective statements or makes statements about his symptoms that are not substantiated by

objective medical evidence, an ALJ must assess the claimant's credibility. *See Felix v. Astrue*, No. 11-CV-3697, 2012 WL 3043203, at *8 (E.D.N.Y. 2012); *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009). Claims of pain can support a finding of disability even if not fully substantiated by objective medical evidence. *See Cabassa v. Astrue*, No. 11-CV-1449, 2013 WL 2202951, at *13 (E.D.N.Y. 2012); *Valet*, 2012 WL 194970, at *21.

The regulations specify a two-step process for evaluating a claimant's assertions about his symptoms. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). At step one, the ALJ evaluates whether a claimant has a medically determinable impairment that "could reasonably be expected to produce the alleged symptoms." 20 C.F.R. § 416.929(b). At step two, if such an impairment exists, the ALJ must determine "the extent to which [the claimant's] symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence" in the administrative record. 20 C.F.R. § 416.929(a); *see also Brown v. Astrue*, No. 08-CV-3653, 2010 WL 2606477, at *6 (E.D.N.Y. June 22, 2010). Because an ALJ has "the benefit of directly observing a claimant's demeanor and other indicia of credibility," the ALJ's decision to discredit subjective testimony must be upheld on review if his disability determination is supported by substantial evidence. *Brown*, 2010 WL 2606477, at *6; *see also Aponte v. Sec'y,*

*Dep't of Health & Human Servs.*, 728 F.2d 588, 591-92 (2d Cir. 1984); *Alcantara*, 667 F. Supp. 2d at 277.

When a claimant's symptoms demonstrate "a greater severity of impairment than can be shown by the objective medical evidence alone," the ALJ must consider the following factors in determining the claimant's credibility: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii); *Alcantara*, 667 F. Supp. 2d at 277-78. The ALJ must explicitly consider each of the above-listed factors before making a determination as to plaintiff's credibility. 20 C.F.R. § 416.929(c)(3); *Van Dien v. Barnhart*, No. 04-CV-7259, 2006 WL 785281, at *12 (S.D.N.Y. 2006).

The ALJ must "consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony," taking into account the listed factors. 20 C.F.R. § 416.929(c)(3); *Alcantara*, 667 F. Supp. 2d at 277-78. When an ALJ finds that an individual is not credible, he must state his reasoning "with sufficient specificity to permit intelligible

33

plenary review of the record." *Cabassa*, 2012 WL 2202951, at *13 (internal quotation marks and citation omitted). Where an ALJ fails to sufficiently set forth his finding that the claimant's testimony was not entirely credible, remand is appropriate. *See, e.g.*, *Tornatore v. Barnhart,* No. 05-CV-6858, 2006 WL 3714649, at *6 (S.D.N.Y. 2006); *Valet*, 2012 WL 194970 at *22.

Here, the ALJ found that although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent alleged. (Tr. 22). The ALJ listed the § 416.929(c)(3)factors in his decision (Tr. 25), but only appears to have considered the claimant's daily activities (the first factor), the type and dosage of any medications to alleviate pain (the fourth factor), and treatments other than medication that the claimant has received (the fifth factor). (Tr. 25-26.) For three reasons, the court concludes that the ALJ's decision regarding plaintiff's credibility was not supported by substantial evidence.

First, the ALJ's finding that plaintiff's claims about his day-to-day activities were implausible reflects a possible misunderstanding of the record. (Tr. 25-26.) The ALJ determined that plaintiff's allegations about his inability to engage in any productive activity or care for himself were too extreme to be credible. (*Id.*) The ALJ cited plaintiff's lack of weight loss

34

(when eating one meal per weekday and only water and fruit juice on weekends) as evidence that plaintiff did not have the limitations that he claimed. (Tr. 26.) The ALJ inferred from plaintiff's continued obesity that plaintiff's statement about subsisting on one meal each day and fluids on weekends was implausible. (*Id.*) In support of his conclusion, the ALJ only cited plaintiff's statement at the hearing that he had not experienced any dramatic weight loss. (Tr. 26.) Other evidence in the record shows, however, that plaintiff had in fact lost weight over the course of his asserted disability, dropping from 270 pounds in 2009 to 245 pounds in 2011. (Tr. 243, 347.) Although plaintiff remained obese, he did lose nearly ten percent of his body weight over the course of two years, which could substantiate his claims about his day-to-day activities. The ALJ also failed to consider that plaintiff's limited mobility could offset the effects of any significant caloric deficiencies that might result from such a restricted diet. The ALJ's credibility finding cannot rest on an inaccurate understanding of testimony directly contradicted by the record. *See Burgess*, 537 F.3d at 131 (rejecting evidence relied upon by the ALJ when "unsupported by anything other than [an] erroneous statement").

Second, the ALJ's finding regarding plaintiff's failure to take prescribed pain medication ignored valid reasons why plaintiff might have abstained from taking prescribed medication.

According to the ALJ, "[i]t is not probable or even likely that an individual in such pain would opt to refuse every sort of palliative care made available to him; the only inference remaining is that the claimant's pain cannot be as severe as he alleges." (Tr. 26.) The ALJ failed adequately to consider reasons why plaintiff may have forgone pain medication, including side effects and financial difficulties. When plaintiff filed a disability report on July 6, 2009, he stated that he was taking pain medications, but that they made him feel drowsy. (Tr. 178.) Later, plaintiff reported that he had started taking a 50 mg dose of Tramadol for pain on April 10, 2008, but said that "it [did] not work" and gave him headaches. (Tr. 212.) When asked if any medications prescribed to plaintiff caused side effects or limited plaintiff's activities, Dr. Dabaghian stated that "[e]verything has side effects." (Tr. 462.) Plaintiff repeatedly stated that he was not taking pain medication because it was not effective, an entirely reasonable explanation not considered by the ALJ. (Tr. 76, 287.) Plaintiff also mentioned to his doctor that he had trouble obtaining the prescribed medications due to problems with his insurance. (Tr. 263.) He reported taking over-the-counter medication after running out of his prescriptions. (Tr. 242.) The ALJ did not consider alternative, reasonable explanations for

plaintiff's failure to take prescribed pain medication when the ALJ determined that plaintiff's claims of pain were not credible.[8]

Third, in rendering his decision, the ALJ did not explicitly weigh each factor listed in 20 C.F.R. § 416.929(c)(3)(i)-(vii). Although the ALJ's decision listed the factors, he did not specifically address: the location, duration, frequency and intensity of plaintiff's alleged pain (the second factor); any precipitating and aggravating factors (the third factor); other methods plaintiff might use to address his pain (the sixth factor); or any other factors concerning plaintiff's

[8] Further, the ALJ cannot cite noncompliance with prescribed treatments to support a credibility determination without fulfilling his obligations under SSR 82-59, 1982 WL 31384 (1982). A claimant may be denied disability benefits if he unjustifiably fails to follow prescribed treatment. 20 C.F.R. § 416.930(a) ("[Y]ou must follow treatment prescribed by your physician if this treatment can restore your ability to work . . . ."); SSR 82-59; *McFadden v. Barnhart,* No. 94-CV-8734, 2003 WL 1483444, at *23 (S.D.N.Y. 2003). Before denying benefits based on a claimant's failure to follow prescribed treatment, however, the ALJ must provide a claimant with: (i) notice of the impact of any noncompliance on his application for benefits; (ii) an opportunity to explain any apparent noncompliance; and (iii) the opportunity to undergo the prescribed treatment. *See Grubb v. Apfel*, No. 98-CIV-9032, 2003 WL 23009266, at *4-5 (S.D.N.Y. 2003). If the Commissioner fails to provide the claimant with notice and an opportunity to address noncompliance with a prescribed treatment, he may not assert such noncompliance as a reason for denying disability benefits. *See id.* at *5; *see also Orr v. Barnhart*, 375 F. Supp. 2d 193, 201 (W.D.N.Y. 2005) ("The regulations and rulings make clear that the ALJ must not draw any inferences about plaintiff's symptoms and their functional effects based on a failure to seek treatment without first considering any explanation or good cause for not doing so." (citations omitted)). There is no evidence in the record to indicate that plaintiff was ever: (1) informed by the ALJ of the effect any noncompliance would have on his eligibility for benefits; (2) given the opportunity to explain any noncompliance; or (3) provided a chance to undergo any treatments he may have declined previously. The ALJ therefore could not rely on plaintiff's noncompliance with prescribed treatment as grounds for denying plaintiff's credibility.

functional limitations and restrictions due to pain or other symptoms (the seventh factor). *See Alcantara*, 667 F. Supp. 2d at 278 (holding that the ALJ erred by not specifically explaining how the listed factors impacted her assessment of plaintiff's credibility and RFC determination); *Lugo v. Apfel*, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998) ("It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms." (internal quotation marks and citation omitted)). The ALJ's failure to address each of the factors regarding credibility determinations in the regulations provides an independent basis for remand. *See Wright v. Astrue,* No. 06-CV-6014, 2008 WL 620733, at *3 (remanding where the ALJ considered only one of the § 416.929(c)(3) factors in evaluating plaintiff's statements about his pain); *Valet*, 2012 WL 194970, at *22 ("Because ALJ Strauss failed to address all of the factors set forth in [§ 416.929(c)(3)], remand is appropriate."); *Tornatore v. Barnhart,* No. 05-CV-6858, 2006 WL 3714649, at *6 (S.D.N.Y. 2006) (remanding where the ALJ did not explicitly consider § 416.929(c)(3) factors in evaluating plaintiff's pain allegations).

Accordingly, the court concludes that remand is appropriate because the ALJ's determination regarding plaintiff's credibility is not supported by substantial evidence and the ALJ failed to apply the correct legal standards. The ALJ overlooked

important issues bearing on credibility in the record and failed to appropriately weigh the requisite factors in evaluating plaintiff's credibility regarding his pain.

## IV.  *The Treating Physician Rule and the Weight Accorded to Other Medical Evidence*

Plaintiff argues that the ALJ erred by failing to give Dr. Dabaghian's opinion controlling weight and did not adequately explain the reasons for the "minimal weight" he assigned to Dr. Dabaghian's opinion.  He contends that the ALJ misapplied the treating physician rule because Dr. Dabaghian's conclusions were supported by: (1) another RFC assessment; (2) a social worker's report; (3) a rehabilitation specialist's report; (4) several diagnostic tests; and (5) plaintiff's own statements about his symptoms.  Plaintiff further argues that the consultative examination reports cited and given significant weight by the ALJ do not necessarily contradict Dr. Dabaghian's assessments.

The Commissioner contends that Dr. Dabaghian's assessment is not entitled to controlling weight because it was based on plaintiff's subjective complaints and is contradicted by the assessments of the consultative examiners and other SIUH specialists.  In support of the minimal weight allotted to Dr. Dabaghian's opinion by the ALJ, the Commissioner argues that the ALJ properly weighed and resolved conflicts in the medical and other evidence in determining plaintiff's RFC.

The Commissioner must evaluate every medical opinion in the administrative record, "[r]egardless of its source," when determining whether a claimant is disabled under the Social Security Act. *See* 20 C.F.R. § 416.927(c); *see also Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182 (E.D.N.Y. 2011). "Acceptable medical sources" that may provide evidence to establish an impairment include, *inter alia*, a claimant's licensed treating physicians and licensed specialists. *See* 20 C.F.R. § 416.913(a). The Commissioner may rely on "other sources," including social workers, to provide evidence of "the severity of [a claimant's] impairment." 20 C.F.R. § 416.913(d); *see also Hernandez*, 814 F. Supp. 2d at 182. Additionally, the ALJ cannot "arbitrarily substitute [his] own judgment for competent medical opinion." *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks and citation omitted).

Under the "treating physician rule**,**" the Commissioner must give "controlling weight" to a treating source's opinion "on the issue(s) of the nature and severity" of a claimant's impairments as long as the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); *see also Shaw v. Charter*, 221 F.3d 126, 134 (2d Cir. 2000) ("[T]he medical opinion of a claimant's treating physician is given controlling weight if it is

well supported by medical findings and not inconsistent with other substantial record evidence."). A treating physician's opinion is given such weight because treating sources are "most able to provide a detailed, longitudinal picture . . . and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). Consultative physician opinions are given less weight because they "are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Hernandez*, 814 F. Supp. 2d at 182–83 (internal quotation marks and citation omitted).

The treating physician rule also "imposes on the Commissioner a heightened duty of explanation when a treating physician's medical opinion is discredited." *Gunter v. Commr. of Soc. Sec.*, 361 F. App'x. 197, 199 n.1 (2d Cir. 2010). If the Commissioner denies controlling weight to the treating source opinion, the Commissioner must "always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [a claimant's] treating source's opinion." 20 C.F.R. § 416.927(c)(2); *see also Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even –

and perhaps especially – when those dispositions are unfavorable."); *Shaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[T]he Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

When the Commissioner refuses to accord controlling weight to the medical opinion of a treating physician, he must explicitly consider various factors in determining how much weight to give to the opinion. *See* 20 C.F.R. § 416.927(c); *see also Burgess*, 537 F.3d at 129 ("[E]ven when a treating physician's opinion is not given 'controlling' weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive."). The Commissioner must consider:

> (1) the frequency of examination and length, nature, and extent of the treatment relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist, and (5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

When the Commissioner does not provide "good reasons" for disregarding a treating physician's opinion, it is appropriate for the reviewing court to remand.[9] *See Shaal*, 134 F.3d at 505;

---

[9] Although the regulations do not provide a precise definition of "good reasons," the case law provides more clarity. *Compare Michels v. Astrue*, 297 Fed. App'x 74, 75-76 (2d Cir. 2008) (upholding the ALJ's decision

*Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion."). The final decision granting or denying disability, however, is the sole province of the Commissioner. Any legal conclusions made by treating physicians and other sources may be properly disregarded. *See Snell*, 177 F.3d at 133 ("[S]ome kinds of findings - including the ultimate finding of whether a claimant is disabled and cannot work - are reserved to the Commissioner." (internal quotation marks and citation omitted)).

### A. Failure to Apply Treating Physician Rule

---

to discount treating physician's opinion due to internal inconsistencies in treating physician's own reports); *Pena v. Astrue*, No. 11-CV-1787, 2013 WL 1210932, at *17-18 (E.D.N.Y. 2013) (upholding ALJ's decision declining to afford controlling weight to treating physician's assessments when other "records stood in 'stark contrast' to [treating physician's] opinion"); *and Halloran v. Barnhart*, 362 F. 3d 28, 32 (2d Cir. 2004) (holding that a treating physician's opinions were not entitled to controlling weight because they "were not particularly informative and [] not consistent with those of several other medical experts"), *with Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (holding that "the lack of clinical findings complained of by the ALJ did not justify the failure to assign at least some weight to treating physician's opinion" and that "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (holding that the physician's "failure to include [clinical] support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical"); and *Moore v. Astrue*, No. 07-cv-5207, 2009 WL 2581718 at *10 n. 22 (E.D.N.Y. 2009) (holding that "inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician").

The ALJ recognized that Dr. Dabaghian was plaintiff's primary care physician (Tr. 26) and therefore should have allocated controlling weight to Dr. Dabaghian's opinion if the opinion was not contradicted by substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").

Dr. Dabaghian served as plaintiff's primary care physician between November 2009 and April 2011. (*See* Tr. 294-95, 298-299, 302-03, 315-16, 319-20.) Dr. Dabaghian's notes consistently reflect plaintiff's complaints of pain in his feet and lower back, and his difficulty walking. (*Id.*) In an RFC questionnaire dated May 25, 2011, Dr. Dabaghian stated that plaintiff could: (1) never lift or carry zero to five pounds; (2) stand or walk for fewer than two hours in a workday; (3) sit for fewer than two hours in a workday without altering position due to his leg pain; and (4) never bend, squat, climb, or reach. (Tr. 462-63.) According to Dr. Dabaghian, plaintiff had to lie down for over four hours each day due to his pain and he could not stand or walk for more than two hours without resting. (*Id.*) Dr. Dabaghian

opined that plaintiff could not work on a regular basis because work would cause his condition to deteriorate. (Tr. 464.)

The ALJ failed to show that Dr. Dabaghian's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques or that it was contradicted by other medical evidence. Instead of addressing Dr. Dabaghian's opinion on the merits, the ALJ cited a questionnaire (on which Dr. Dabaghian wrote that plaintiff "claims he can't walk" (Tr. 463)) and proceeded to disregard Dr. Dabaghian's entire assessment as based solely on plaintiff's subjective complaints. (Tr. 27.) The ALJ asserted that Dr. Dabaghian's note "indicates that the questionnaire was completed based on the claimant's subjective complaints, rather than on an objective review of the claimant's functional abilities. . . . As a result, Dr. Dabaghian, even as a long-time treating primary care physician, can only be accorded minimal weight." (Tr. 27.) As an initial matter, if there was any ambiguity as to the basis of Dr. Dabaghian's opinion, the burden was on the ALJ to contact Dr. Dabaghian in order to fill any gaps or answer any questions with regard to his reports. (*See infra* Discussion Part V.) Dr. Dabaghian does not reference plaintiff's subjective complaints anywhere else in the questionnaire, but he *does* refer to other medical evidence, including plaintiff's MRI results. (Tr. 461-465.) Moreover, "medically acceptable clinical and laboratory diagnostic techniques" include the "patient's

report of complaints, or history, [a]s an essential diagnostic tool." *Burgess*, 537 F.3d at 128; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003).

Upon review of the entire record, the court finds that Dr. Dabaghian's assessments are generally consistent with the medical evidence as a whole. Evidence from MRIs and x-rays indicates that plaintiff's conditions could cause him pain. (Tr. 229, 237, 340, 412, 419, 457.) Reports from plaintiff's treating physicians, specialists, consultative examiners, and social workers also consistently indicate that plaintiff suffers from severe, chronic pain.

Dr. Christopher Szeles diagnosed plaintiff with bilateral hallux osteoarthritis and opined that he would be unable to work. (Tr. 468.) Although the ALJ is not bound by a physician's statements that a claimant cannot work or other legal conclusions, he is required to consider their diagnosis and evaluations as evidence. *See* 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."); *see also Rosa*, 168 F.3d at 78-79 ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (internal quotation marks and citation omitted).

Several diagnostic and clinical findings also support Dr. Dabaghian's assessments. On March 27, 2008, Dr. Thakurdial ordered x-rays after plaintiff complained of pain and fungal toe

nails. (Tr. 263.) The x-ray of the right foot showed that "joint spaces demonstrate moderate 1st MTP joint degenerative change with a 6 mm subchondral cyst in the metatarsal head," a "6 mm insertional Achilles enthesophyte," and "mild dorsal mid-foot soft tissue swelling." (Tr. 228, 236, 342, 414.) The x-ray of the left foot showed that "at the IP joint of hallux, there is a well-corticated ossicle at the attachment of collateral ligaments suggesting chronic sprain," mild 1st MTP joint degenerative change, and a 2 mm plantar and 4 mm posterior heel spur. (Tr. 229, 237, 340, 412.) On September 24, 2008, an MRI requested by Dr. Goldstein showed "edema within the distal margin of the first metatarsal without discrete fracture line," which "suggested osteochondral injury involving the distal margin of the first metatarsal." (Tr. 419.) An MRI of plaintiff's lumbar spine taken on November 4, 2010 showed spondyloarthritic changes with loss of disc height and annular bulging of the T12-L1 disc. (Tr. 457.) Additionally, as noted, the ALJ considered the diagnostics and found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 22.)

Other evidence in the record also generally supports Dr. Dabaghian's opinion. Social worker Mottola's reports note that plaintiff often experiences "excruciating lower back/foot pain," has limited mobility, is "wheelchair dependent," and is "essentially homebound." (Tr. 424.) Social worker opinions are

not to be allocated controlling weight, but are medical sources that must be considered. *See Genovese v. Astrue*, No. 11-CV-02054, 2012 WL 4960355, at *15 (E.D.N.Y. 2012) ("[I]f an ALJ determines that the opinion of a licensed social worker is not entitled to any weight, the ALJ . . . must explain that decision or risk remand." (internal quotation marks, citation, and alterations omitted)). The ALJ gave Mottola's observations only minimal weight because "she cites only to the claimant's subjective complaints rather than objective clinical examination and laboratory or diagnostic findings." (Tr. 27.) Mottola's observations, however, provide important corroboration for Dr. Dabaghian's assessment and plaintiff's claims about his symptoms.

As noted above, when an ALJ allocates minimal weight to the opinion of a treating physician, as the ALJ did in this case, he is required to give "good reasons" for doing so. 20. C.F.R. § 416.927(c)(2)-(6). After making a determination, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33. Here, the ALJ gave only two reasons for disregarding Dr. Dabaghian's assessment: (1) the RFC questionnaire filled out by Dr. Dabaghian appeared to be based only on plaintiff's subjective complaints about his symptoms and (2) Dr. Dabaghian's opinion conflicted with the consultative examiners and other medical evidence. (Tr. 26-27.)

The court concludes that the ALJ failed to provide "good reasons" for disregarding Dr. Dabaghian's assessment. The ALJ erred by failing to expressly consider the length of the treatment relationship and the frequency of examination, the nature and extent of the treating relationship, and the specialization of the treating physician. *See Burgess*, 537 F.3d at 129-30; *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507 (S.D.N.Y. 2014) (holding that remand was appropriate because the ALJ erred by "failing to explicitly consider several factors, including the [treating physician's] specialty, and the frequency, length, nature, and extent of the treatment"); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 267 (E.D.N.Y. 2010) (holding that remand was appropriate because the ALJ erred by not referencing "the various factors that must be considered in deciding what weight to give the opinion of a treating physician"). Additionally, as demonstrated by the evidence outlined above corroborating Dr. Dabaghian's assessment, the ALJ's conclusion that Dr. Dabaghian's opinion was unsupported by the medical evidence and inconsistent with the rest of the record was incorrect.

**B.  Inappropriate Weight Allocated to the Opinions of Consultative Examiners**

In determining plaintiff's RFC, the ALJ appears to have allotted the most weight to the opinions of Dr. Shulman and Dr. Govindaraj.   Dr. Anita Shulman performed a consultative

examination on plaintiff on August 26, 2009. (Tr. 242-44.) Dr. Govindaraj performed a consultative examination on June 23, 2011. (Tr. 347-348.) The ALJ's heavy reliance on the opinions of physicians who only saw plaintiff a single time — one who conducted her evaluation more than two years before the hearing — was improper. The Second Circuit has repeatedly determined that when there are conflicts between the treating and consulting sources, the "consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir. 1990). The opinions of consulting sources are to be given less weight because the exams "are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Id.* (internal quotation marks and citation omitted). "The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence." *Simmons v. United States R.R. Ret. Bd.,* 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citation omitted).

Beyond allocating inappropriate weight to Dr. Shulman's consultative examination, the ALJ quoted selectively from Dr. Shulman's assessment to support his conclusions. The ALJ refers only to Dr. Shulman's statement that plaintiff should be restricted from "prolonged" standing, pushing, pulling, and lifting. (Tr.

26.)  The ALJ did not consider Dr. Shulman's observations that plaintiff could not walk without the assistance of his cane; that he was unable to walk on his heels and toes; and that he had an abnormal stance.  (Tr. 242-43.)  Dr. Shulman also noted that plaintiff showed "limited flexion/extension" of the lumbar spine, "slight redness around the first MTP joint on both toes," and "evidence of swelling on the dorsum of his feet."  (Tr. 244.) Although Dr. Shulman's observations are not dispositive of plaintiff's alleged disability, they strongly refute the ALJ's finding that plaintiff could stand for six hours out of an eight-hour work day.  Additionally, plaintiff repeatedly described his pain as worsening over time and medical reports characterize his illnesses as "degenerative," suggesting that an examination conducted two years prior to the hearing may provide outdated information.  (Tr. 185, 211-212, 250, 294-95, 298-99, 302-03, 315-16, 319-20, 342, 439.)

      The weight allocated to Dr. Govindaraj's consultative examination was also inappropriate.  During his examination with Dr. Govindaraj, plaintiff refused to leave his wheelchair, so Dr. Govindaraj did not have an opportunity to fully examine plaintiff. (Tr. 347-48.)  Dr. Govindaraj could not evaluate plaintiff's ability to walk or stand, or perform other tasks essential to making an accurate determination regarding plaintiff's RFC.  Dr. Govindaraj did observe that plaintiff's overall prognosis was

good, but his observations on their own are too vague to provide substantial evidence for the ALJ's RFC or to contradict Dr. Dabaghian's assessment. *See Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (recognizing that a physician's opinion may be "so vague as to render it useless in evaluating" whether a claimant could perform sedentary work).

As noted, the Second Circuit "has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the consulting physician's opinions or report should be given limited weight." *Harris v. Astrue*, No. 07-CV-4554, 2009 WL 2386039, at *14 (E.D.N.Y. 2009) (internal quotation marks and citation omitted). Accordingly, it was improper for the ALJ to afford significant weight to the opinions of consultative examiners Dr. Shulman and Dr. Govindaraj.

Because the ALJ failed to properly apply the treating physician rule and inappropriately gave significant weight to consultative physicians, the court concludes that remand is appropriate.

## V.   *The ALJ's Affirmative Duty to Develop the Record*

Additionally, plaintiff argues that the ALJ failed to develop the record. He contends that: (1) there is no evidence that the ALJ fulfilled his obligation to seek out additional and clarifying information from Dr. Dabaghian; (2) there are multiple significant information gaps in the record that the ALJ had a duty

to fill; and (3) the ALJ's own questioning of plaintiff at the hearing failed to develop the record.

The Commissioner must "make every reasonable effort" to assist the claimant in developing a "complete medical history." 20 C.F.R. § 416.912(d); *Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782, 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."). The Second Circuit has held that an "ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal quotations marks and citation omitted). The ALJ's duty to develop the record "exists even when the claimant is represented by counsel." *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (internal quotations marks and citation omitted). The ALJ "cannot reject a treating physician's diagnosis without first attempting to fill in any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79; *Cabassa*, 2012 WL 2202951, at *10 ("If an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor." (citation omitted)).

Here, the ALJ did not adequately develop the record with regard to Dr. Dabaghian's RFC assessment, plaintiff's treating

relationship with Dr. Dabaghian, or plaintiff's claims about his symptoms. The ALJ should not have allocated minimal weight to Dr. Dabaghian's opinion, without first fulfilling his obligation to seek out necessary additional or clarifying information and fill any gaps in the record.

First, the ALJ inferred from some of Dr. Dabaghian's notes that his RFC assessment was based entirely on plaintiff's claims about his symptoms, "rather than on an objective review of the claimant's functional ability." (Tr. 27.) As outlined above, the ALJ should have contacted Dr. Dabaghian in order to verify that plaintiff's subjective statements were indeed the sole basis for Dr. Dabaghian's assessment. *See* 20 C.F.R. § 416.912(e)(1) (recognizing that the Commissioner "will seek additional information evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques").

Second, many of the doctors' notes in the record, particularly Dr. Dabaghian's, are largely illegible. (Tr. 294-95, 298-99.) There are also multiple sets of handwriting on some reports. (Tr. 294-95, 298-99, 302-03, 315-16, 319-20, 461-465.) Because much of Dr. Dabaghian's comments are unclear, the ALJ had

an affirmative duty to seek out clarifying information. *See Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) ("Where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation.").

The ALJ's failure to develop the record, particularly with regard to Dr. Dabaghian's assessment and diagnosis, warrants remand.

## CONCLUSION

For the foregoing reasons, the court concludes that the ALJ's determination of plaintiff's RFC is not supported by substantial evidence and that the ALJ misapplied legal standards in making his disability determination. The case is therefore remanded for further proceedings consistent with this memorandum and order. Specifically, the ALJ should (consistent with the reasoning in this memorandum and order):

(1) Evaluate plaintiff's credibility considering the totality of the evidence in the record and provide specific findings pursuant to 20 C.F.R. § 416.929(c)(3).

(2) Review the entirety of the evidence in the record and, if he declines to afford controlling weight to Dr. Dabaghian's RFC assessment, provide a clear and explicit statement of his reasoning.

(3) Fully develop the record with regard to plaintiff's treating relationship with Dr. Dabaghian.

**SO ORDERED.**

Dated:     August 18, 2016
           Brooklyn, New York

                          _____/s/_____
                          **KIYO A. MATSUMOTO**
                          United States District Judge
                          Eastern District of New York